**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:20-cv-02757-DDD-STV

FITNESS TOGETHER FRANCHISE, L.L.C.,

      Plaintiff,

v.

EM FITNESS, L.L.C.;
FT THREE, L.L.C.;
FT POLAND, L.L.C.;
AXIO FITNESS CANFIELD, L.L.C.;
AXIO FITNESS HOWLAND, L.L.C.;
AXIO FITNESS POLAND, L.L.C.; and
ERIN MELLINGER,

      Defendants.

---

**ORDER DENYING AXIO DEFENDANTS' MOTION TO DISMISS
AND GRANTING IN PART FITNESS TOGETHER FRANCHISE
LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

---

In a standard franchise agreement, the franchisor allows the franchisee to use its marketing materials, trademarks, trade secrets, and client lists to set up a new business. In return, the franchisee typically pays a fee for the right to operate that franchised business.

But what happens when the franchisee later wants to strike out on her own? If, as is normally the case, her franchise agreements contain noncompetition clauses, she must either wait until the specified period has passed or move outside the specified geographic area. In this case, the defendants, who operated fitness studios franchised by the plaintiff, did neither. Instead they terminated their franchises, created new

companies and immediately began to operate studios under a new name in the same locations, with the same staff, same clients, and same services.

The plaintiff franchisor has sued and moved the court to enjoin operation of those studios pending trial on the merits. At least for purposes of this motion, the defendants do not dispute that the new studios violate the terms of the noncompetition clause. The only real dispute at this point is whether this court has jurisdiction over the new entities that own them, which were organized in Ohio. The court concludes that it does, and therefore denies the motion to dismiss filed by those entities and grants in part the plaintiff's motion for a preliminary injunction.

## BACKGROUND

Plaintiff Fitness Together Franchise, L.L.C. ("Fitness Together") and Defendants Erin Mellinger, EM Fitness, L.L.C., FT Three L.L.C., and FT Poland, L.L.C. (collectively, the "Franchisee Defendants") entered into three separate franchise agreements for three gyms respectively owned by these three Franchisee Defendant LLCs. (Docs. 46–3 (agreement for the Poland, Ohio studio), 46–4 (agreement for the Howland, Ohio studio), 46–5 (agreement for the Canfield, Ohio studio) (collectively, the "Franchise Agreements").) Ms. Mellinger is the owner of the three LLC Franchisee Defendants, which she claims are "now-defunct." (Doc. 46–46 at p. 1.) All agreements had an initial term of ten years. (Doc. 46–3 at p. 8; Doc. 46–4 at p. 11; Doc. 46–5 at p. 8.)

First, Ms. Mellinger signed the agreement for her studio in Poland, Ohio as an individual, and that agreement had an effective date of September 30, 2011. (Doc. 46–3 at p. 44.) That agreement granted Ms. Mellinger the right to open a Fitness Together franchise gym in Poland, Ohio. (*Id.* at p. 45.) In the event of termination of the agreement, the

agreement bars Ms. Mellinger and any "Bound Party" from having any interest in a fitness studio within a three-mile radius of the franchise gym for two years. (*Id.* at pp. 35–36.) The contract defines "Bound Parties" to include directors or other owners of the gym, Ms. Mellinger's spouse, and her "immediate family member[s]." (*Id.* at p. 35.) The agreement also provides that Fitness Together would transmit its confidential information, including purported trade secrets, to Ms. Mellinger for purposes of operating the gym. (*Id.* at p. 36.) That section of the agreement restricts Ms. Mellinger's use of trade secrets and had an accompanying assignment clause relating to certain intellectual property created during the term of the agreement. (*Id.* at pp. 36–37.) The agreement has a Colorado choice-of-law clause, a Colorado forum-selection clause, and a binding-arbitration clause governed by the Federal Arbitration Act. (*Id.* at pp. 37–39.) But the contract also contains a clause stating that "Nothing in this Agreement shall prevent us or you from seeking injunctive relief in appropriate cases to prevent irreparable harm." (*Id.* at p. 42.)

Second, Ms. Mellinger signed the agreement for her Howland, Ohio studio on behalf of FT Three L.L.C. (Doc. 46–4 at pp. 52–53.) That agreement has an effective date of October 1, 2013. (*Id.* at p. 53.) Like the Poland agreement, the Howland Agreement has substantially similar clauses covering non-competition for two years within a three-mile radius of the gym (*Id.* at pp. 42–43); bound parties (*Id.* at p. 42); trade secrets and intellectual property (*Id.* at pp. 43–44); and forum selection, choice of law, arbitration, and injunctive relief (*Id.* at pp. 44–47, 50).

Third, Ms. Mellinger signed the agreement for her Canfield, Ohio studio on behalf of EM Fitness L.L.C. (Doc. 46–5 at pp. 52–53.) That agreement has an effective date of August 20, 2018. (*Id.* at p. 52.) Like the Poland and Howland agreements, the Canfield agreement has substantially similar clauses covering non-competition for two years within

a three-mile radius of the gym (*Id.* at pp. 41–42); bound parties—with the exception that "immediate family members" are not included (*Id.* at p. 41); trade secrets and intellectual property (*Id.* at pp. 42–43); and forum selection and choice of law. (*Id.* at pp. 44–45.) The Canfield Agreement, notably, exempts claims arising out of breach of the non-compete provisions or trade secret misappropriation from arbitration. (*Id.* at p. 46.)

In April 2020, Ms. Mellinger informed Fitness Together that she desired to close her gyms so that she could open new ones under a different brand and asked Fitness Together to waive the non-compete provisions in the Franchise Agreements. (Doc. 13 at ¶¶ 48–49.) Fitness Together declined, but Ms. Mellinger and Fitness Together began negotiating a termination of the Franchise Agreements. (*Id.* at ¶¶ 50–51.) The parties signed a termination agreement on July 30, 2020 that terminated the three Franchise Agreements. (Doc. 46–6 (the "Termination Agreement").) Pursuant to that agreement, Ms. Mellinger agreed to discontinue operations at her three gyms and to direct her clients to other Fitness Together gyms. (Doc. 46–6 at pp. 2–3.) In exchange for $48,000, Fitness Together agreed to reduce the duration of the non-compete provisions under the Franchise Agreements from two years to one year. (*Id.* at p. 4.) Provisions of the Franchise Agreements governing non-competition (except as modified in the termination agreement), governing law, confidential information, dispute resolution, and litigation survived the Termination Agreement. (*Id.*)

During the negotiation of the Termination Agreement, Ms. Mellinger allegedly formed Axio Fitness Canfield, L.L.C., Axio Fitness Howland, L.L.C., and Axio Fitness Poland, L.L.C. (collectively, the "Axio Defendants") with the intent to violate the terms of that Termination Agreement. Fitness Together has provided substantial evidence connecting

Ms. Mellinger and the Franchisee Defendants to the Axio Defendants' conduct, including:

- An email purportedly written by a Franchisee Defendant employee describing Ms. Mellinger as "breaking away from corporate" and "opening [new gyms] under Erin's new name of Axio Fitness." (Doc. 46–8 at p. 1.)

- Emails demonstrating that Ms. Mellinger used her Fitness Together-issued email to discuss buying new fitness equipment for the Axio gyms post-Termination Agreement. (Doc. 46–12 at p. 1.)

- Emails demonstrating that agents of the Franchisee Defendants used a Fitness Together-issued email address to arrange client sessions for a new Axio gym post-Termination Agreement. (Doc. 46–17 at pp. 1–3.)

- A screenshot of the Axio Fitness website—which has since been changed—taken post-Termination Agreement that lists Erin Mellinger as "Owner" of the Axio gyms. (Doc. 13 at ¶¶ 66–67.)

- Evidence that someone registered domain names for "axiofitness.com" on April 19, 2020. (Doc. 13 at ¶ 58.) And evidence that the same month, someone created new Facebook pages for "Axio Fitness" locations in the three cities where the Franchisee Defendants operated. (*Id.* at ¶ 59.)

- Evidence that, two days before the Termination Agreement was signed, registration papers for the Axio Defendants were

filed with the Ohio Secretary of State, listing Ms. Mellinger's mother as agent for service of process. (Doc. 46–7.)

- Evidence that, within a month of the Termination Agreement being signed, there were new gyms open at the former franchise locations under the name "Axio Fitness." (*See* Doc. 13 at ¶ 61.)

- Photographs purportedly showing that the Axio Defendants were using Fitness Together's trademarks on their signage and door mat at one location. (*Id.* at ¶¶ 77–78.)

Fitness Together filed this suit seeking an emergency temporary restraining order against the Franchisee Defendants. (Docs. 1, 3.) The court denied that motion but allowed Fitness Together to re-file its motion for a temporary restraining order as a motion for a preliminary injunction. (Doc. 10.) Fitness Together did so. (Doc. 14.) And Fitness Together amended its complaint to add the Axio Defendants to the suit. (Doc. 13.)

The Franchisee Defendants filed a response to Plaintiff's motion for preliminary injunction in which they ostensibly stipulated to the relief sought by Plaintiffs. (Doc. 23 at p. 2.) The Axio Defendants responded to the preliminary-injunction motion by filing a motion to dismiss, arguing that the court lacks personal jurisdiction and therefore cannot enjoin them. (Doc. 22.) The court held a hearing on the parties' motions. (Doc. 45.)

# ANALYSIS

## I.    Motion to Dismiss for Lack of Personal Jurisdiction

"The plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984) (citation omitted). "Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing." *Id.* (citations omitted).

> The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.

*Id.* (citations omitted).

Here, Fitness Together makes a prima facie case, based on the allegations in the complaint and over forty submitted exhibits, that the Axio Defendants are bound to this court's jurisdiction via the forum-selection clauses in the Franchise Agreements. The court therefore need not evaluate Fitness Together's alternative theory of personal jurisdiction based on the Axio Defendants' minimum contacts with Colorado.

### A.    The Franchise Agreements' Forum-Selection Clauses Bind the Non-Signatory Axio Defendants and Confer Personal Jurisdiction

A court "may obtain personal jurisdiction over a defendant in three ways: consent by the parties, presence in the forum state, and actions by the defendant which affect people in the forum state." *Qwest Communications Int'l, Inc. v. Thomas*, 52 F. Supp. 2d 1200, 1204 (D. Colo. 1999). "Because the requirement of personal jurisdiction represents first of all

an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Because this right is waivable and forfeitable, "there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (citing *Compagnie*, 456 U.S. at 703). "For example . . . parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction." *Id.* "Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process." *Id.* (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). The Supreme Court recently held that valid forum-selection clauses "should be given controlling weight in all but the most exceptional cases," at least in the context of transfer under 28 U.S.C. § 1404(a). *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013).

There is no dispute that this doctrine applies here to the Franchisee Defendants, who are all signatories to the agreements in question. The argument is whether the forum-selection clauses also apply to the non-signatory Axio Defendants. They do.

Courts—under a variety of doctrines—have enforced forum-selection clauses against non-signatories.[1]

---

[1]   It remains unclear what law would govern whether a non-signatory is bound to a forum-selection clause in a diversity action or for supplemental state-law claims like those at issue here. "Courts disagree which law—federal law, forum state law, or parties' contracted-for law—governs the enforceability and the interpretation of forum selection clauses." *State ex rel. Balderas v. Real Estate Law Ctr., P.C.*, 430 F. Supp. 3d 900, 929 (D.N.M. 2019). The *Balderas* court surveyed the federal circuits, finding that many of them applied federal law to issues of

Several federal courts have adopted a "closely related" doctrine in this context, whereby "non-signatories to a contract are subject to its valid forum selection clause if they, or the claims they bring, are 'closely related to the contractual relationship.'" *PFC Payment Sols., LLC v. Element Payment Servs., Inc.*, No. 12-cv-01472-CMA-MJW, 2012 WL 3264305, at *3 (D. Colo. Aug. 10, 2012) (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988)). One court has described this doctrine as "widely accepted," and variations of the doctrine appear to remain good law in at least five circuits outside the Tenth Circuit.[2] Proponents of the doctrine note that it prevents "parties to

---

"enforceability" while some applied state law to issues of "interpretation"—particularly where the relevant contract had a choice-of-law clause pointing to state law. *See id.* at 929–34. The Tenth Circuit recently held that "the scope of a forum-selection clause is evaluated according to ordinary principles of contractual interpretation" and assumed, without deciding, that Canadian law "would apply similar contractual principles as our own." *Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1092 (10th Cir. 2019). The Supreme Court of Colorado has recognized a number of doctrines adopted from federal cases that can bind non-signatories to arbitration clauses, including agency, veil-piercing, estoppel, successor-in-interest, and third-party beneficiary. *N.A. Rugby Union LLC v. U.S.A Rugby Football Union*, 442 P.3d 859, 863–64 (Colo. 2019) (citing federal cases). Because Colorado has shown a willingness to bind non-signatories in the related arbitration context under a variety of common-law doctrines also applied in federal courts, the court sees no apparent conflict of law here. The court therefore looks to federal and Colorado caselaw and applies accepted contractual principles to the question of non-signatory enforceability.

[2]   *AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 708 (E.D. Pa. 2014) (citation and internal quotation marks omitted). The Second, Seventh, Eighth, Ninth, and Eleventh Circuits have all adopted variations of the doctrine. *Manetti-Farrow*, 858 F.2d at 514 n.5 (Ninth Circuit); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998); *Marano Enters. of Kan. v. Z-Teca Restaurants, L.P.*, 254 F.3d 753, 757 (8th Cir. 2001); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 208 (7th Cir. 1993); *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (allowing non-signatory to enforce clause against signatory).

contracts from using evasive, formalistic means lacking economic substance to escape contractual obligations." *Magi XXI*, 714 F.3d at 722 (quoting *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2nd Cir. 2009)). Indeed, "were it not for judicial willingness in appropriate circumstances to enforce forum selection clauses against affiliates of signatories, such clauses often could easily be evaded." *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 441 (7th Cir. 2012). "For example, a signatory of a contract containing such a clause might shift the business to which the contract pertained to a corporate affiliate— perhaps one created for the very purpose of providing a new home for the business—thereby nullifying the clause." *Id.* Courts have further reasoned that this doctrine comports with the Supreme Court's precedent favoring the enforcement of such clauses absent extraordinary circumstances. *See, e.g.*, *id.* at 441–42.

But the doctrine has critics as well. One court has described the doctrine as "so vague as to be unworkable." *Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F. Supp. 2d 550, 556 (N.D. Tex. 2009) (nevertheless applying the "closely related" and third-party beneficiary doctrines to bind a non-signatory). Indeed, the vagaries of the "closely related" doctrine—which is a consent-based jurisdictional doctrine—appear to operate somewhat in tension with the Supreme Court's approach in the related minimum-contacts context. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980) (noting that "'foreseeability' alone is not a sufficient benchmark for personal jurisdiction").

Other courts have opted instead to apply more traditional, and less amorphous, contract doctrines to bind non-signatories. *See, e.g.*, *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 62 n.6 (3d Cir. 2018) (noting that it was unclear "whether we even recognize the closely related doctrine" and describing the doctrine as "a form of equitable

estoppel"). For instance, one court, in addition to the "closely related" doctrine, applied "estoppel" and "assumption" doctrines to bind a non-signatory to a forum-selection clause. *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 155-62 (E.D.N.Y. 2012). And courts frequently apply assumption, agency, estoppel, and successor-in-interest theories to bind non-signatories to arbitration clauses, noting that these theories "comport with settled principles of contract and agency law." *N.A. Rugby*, 442 P.3d at 864 (citing to federal cases); *see also Raintree Vacation*, 702 F.3d at 339–44.

The court need not resolve any debate over the merits of the "closely related" doctrine. "Closely related" appears to be an umbrella term that refers to a variety of common law doctrines courts use to bind non-signatories to contracts, including third-party beneficiaries, successors-in-interest, principals of signatory agents, and alter egos. *See, e.g., Raintree Vacation*, 702 F.3d at 339 (noting that this is a "vague standard" that "can be decomposed into two reasonably precise principles, which we'll call 'affiliation' and 'mutuality'"). The Axio Defendants are clearly bound to the forum selection clauses under not only the generic "closely related" doctrine but under the more traditional doctrines of estoppel, successor liability, and principal-agent liability. Regardless of the doctrinal lens, the facts here bind the Axio Defendants to the forum selection clauses.

### i.    Closely Related

Several cases applying this "close relationship" doctrine mirror the facts alleged here, and the principles underlying that doctrine strongly favor enforcement of the forum-selection clauses against the Axio Defendants. In *Romano*, for instance, the court enforced a forum-selection clause against the wife of a former franchisee. 42 F. Supp. 3d at 709. The

court also found that the husband/former franchisee "continue[d] to be involved in the new" franchise that the wife owned, suggesting that she was a "third-party beneficiary of the knowledge and experience" that the husband gained through his relationship with the franchisor as a former franchisee. *Id.* Similarly here, sufficient evidence demonstrates that Ms. Mellinger had her mother create the Axio Defendants to circumvent her contractual obligations. (Doc. 46–7; Doc. 13 at ¶ 65.)

As in *Manetti-Farrow*, the non-signatory Axio Defendants received customer lists and business lists via the signatories' relationship. 858 F.2d at 514. (Doc. 46–17 at pp. 1–3 (using Fitness Together-issued emails to transfer former Fitness Together clients for the new Axio gyms); Doc. 46–12 at p. 1. (Ms. Mellinger using Fitness Together-issued email to order new gym equipment for the Axio gyms).) And like the defendant in *Hugel v. Corporation of Lloyd's*, Ms. Mellinger brought the Axio Defendants, which the evidence shows she controlled, into her dispute with Fitness Together.[3] *See* 999 F.2d 206, 208 (7th Cir. 1993). Ample facts establish a close relationship here.

The Axio Defendants largely do not dispute these allegations, or even that the facts here fit within the concept of a closely-related party, as courts have applied that doctrine; instead, they argue that it was not "foreseeable" that the Axio Defendants would be bound to the forum-

---

[3]   Neither party has produced documentation, such as the articles of organization for the Axio Defendants, that could confirm who the Axio Defendants' members are. Counsel for the Defendants have argued that Ms. Mellinger's mother is the "sole owner" of at least one of the Axio Defendants but provided no documentary support for that assertion. (Doc. 38 at p. 4.) But Fitness Together has provided evidence that Ms. Mellinger made significant business decisions on behalf of the Axio Defendants and was listed as an "owner" on their website. (Doc. 46–12 at p. 1; Doc. 13 at ¶¶ 66–67.)

selection clauses. (Doc. 38 at pp. 1–7.) For instance, the Axio Defendants point to provisions in the Franchise Agreements defining the "Bound Parties" who are subject to the non-compete clause. (*Id*. at pp. 3–7.) The Axio Defendants appear to concede that "it would be reasonably foreseeable" that those defined parties, even if they were non-signatories, "would be subject to this court's jurisdiction" pursuant to the forum-selection clauses. (*See id*. at p. 3.) But the Axio Defendants argue that because they are not listed in those agreements as Bound Parties they could not have foreseen being haled into court here. (*See id*. at pp. 3–7.)

This argument is backwards. To be sure, some courts in this district have analyzed "foreseeability" when deciding whether to bind non-signatories to forum-selection clauses. *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-2324, 2008 WL 2185882, at *8 (D. Colo. May 23, 2008); *ADT Sec. Servs., Inc. v. Apex Alarm, LLC*, 430 F. Supp. 2d 1199, 1201 (D. Colo. 2006). But such clauses are not enforceable based on their being foreseeable; enforcement is foreseeable because the parties are closely related.[4] Thus, for example, while the contracts' language may bear on whether a non-signatory is a third-party beneficiary, establishing that the Axio Defendants are third-party beneficiaries is unnecessary here because that is just a particular subset of the kind of close relationship that satisfies this requirement.[5]

---

[4]   In *Xantrex* an employee switched jobs. His ex-employer, as a non-signatory, sought to enforce a forum selection clause found in a contract between the employee and his new employer. *Xantrex*, 2008 WL 2185882, at *1-5. The court did not allow the non-signatory to enforce the clause, finding that that party had "no connection" to the contract. *Id*. at *8.

[5]   "Plaintiffs argue that the court must make a threshold finding that a non-party to a contract is a third-party beneficiary before binding him to a forum selection clause. While it may be true that third-party beneficiaries of a contract would, by definition, satisfy the 'closely related'

In the related context of minimum-contacts-based specific jurisdiction, "'foreseeability' alone is not a sufficient benchmark for personal jurisdiction." *World-Wide Volkswagen*, 444 U.S. at 287. But the closely-related doctrine is better understood as a species of consent-based jurisdiction rather than a targeting of the forum state under the minimum-contacts doctrine. By undertaking activities that a closely-related party has contractually agreed will be subject to a forum-selection clause with knowledge of the signatory's agreement, the non-signatory has, effectively, consented to application of the forum-selection clause in the contract.

Applied here, the "closely related" doctrine compels a finding that Ms. Mellinger's and the other Franchisee Defendants' close relationship with the Axio Defendants binds the Axio Defendants to the forum selection clauses in the Franchise Agreements. Indeed, the doctrine was developed precisely to thwart actions like Ms. Mellinger's. *Raintree Vacation*, 702 F.3d at 441 ("For example, a signatory of a contract containing such a clause might shift the business to which the contract pertained to a corporate affiliate—perhaps one created for the very purpose of providing a new home for the business—thereby nullifying the clause."). The close relationship arises directly from benefits that the Franchisee Defendants derived from the Fitness Together-Franchisee Defendant contractual relationship. *Romano*, 42. F. Supp. 3d at 709. Even though they are non-signatories, the Axio Defendants are nevertheless bound to the forum-selection clauses, having apparently been created and operated by a signatory to engage in activities covered by the agreements.

---

and 'foreseeability' requirements, a third-party beneficiary status is not required." *Hugel*, 999 F.2d at 210 n.7.

### ii.        Estoppel

Equitable estoppel, which can prevent a party that has directly ben-efited from an agreement they are not technically a party to from avoid-ing forum-selection or arbitration clauses, also supports jurisdiction here. *See, e.g.*, *N.A. Rugby*, 442. P3d at 866 (non-signatory can be bound to an arbitration clause when "the nonsignatory has knowingly exploited that agreement, as for example, by claiming or accepting direct benefits of the agreement"); *Contact 911*, 874 F. Supp. 2d at 155-57 (collecting Second Circuit cases).

The Axio Defendants were created two days before Ms. Mellinger signed the Termination Agreement. That agreement incorporated not only the Franchise Agreements' forum selection clauses but also various clauses governing the Fitness Together-Franchisee Defendants relation-ships. The Axio Defendants—through their agents and Ms. Mellinger—subsequently and knowingly exploited that relationship. They used Fit-ness Together-issued emails and client information to poach customers, to poach former Fitness Together trainers, and to order new gym equip-ment. They also infringed Fitness Together's trademarks outside at least one of the new Axio gyms. Fitness Together has thus made a prima facie showing that the Axio Defendants are estopped from avoiding the forum-selection clauses.

### iii.       Successor Liability

A successor company assumes the liabilities of the transferor if "the purchasing corporation is merely a continuation of the selling corpora-tion" or "the transaction is entered into fraudulently in order to escape liability for such debts." *Ruiz v. ExCello Corp.*, 653 P.2d 415, 416 (Colo. Ct. App. 1982). And "[i]f successorship is established, a non-signatory is subject to the *M/S Bremen* presumption of the enforceability of

mandatory forum selection clauses." *Aguas*, 585 F.3d at 701–702 (applying successorship under New York law which contains the same liability exceptions listed above under Colorado law).

The Axio Defendants are bound under either of these successor liability theories. There is ample evidence that the Axio Defendants are a "mere continuation" of the Franchisee Defendants. Ms. Mellinger attested that the Franchisee Defendants are "now-defunct" but acted as the de facto owner and manager of the Axio Defendants that appeared to assume all of the Franchisee Defendants' assets and resumed their operations at the same locations. The very reason for the Axio Defendants' existence is to evade the terms of the Franchisee Defendants' agreements. Whether Ms. Mellinger or her mother technically owned or organized the Axio Defendants, it is clear Ms. Mellinger herself acted as an agent of the Axio Defendants, for example, by buying fitness equipment for Axio gyms with her Fitness Together email account. (Doc. 46–12 at p. 1.) Leading up to this lawsuit, the Axio Defendants used Fitness Together's branding, logos, and email accounts. Fitness Together's written submissions confirm that Ms. Mellinger reorganized her companies with the intent to "escape liability" imposed by the Franchise and Termination Agreements.

### iv.    Agency

Agency doctrine, too, binds the Axio Defendants to the forum-selection clauses. "A contract that the agent of secret principals makes with a third party can be enforced . . . against the secret principals." *Raintree Vacation*, 702 F.3d at 442–43 (citing *Restatement (Third) of Agency §§ 6.03)).

Here, Ms. Mellinger, when signing the Termination Agreement, acted as an agent of undisclosed principals: the Axio Defendants. The

Axio Defendants were created two days before the signing of that agreement. (Doc. 46–7 (Axio LLCs registered on July 28, 2020); Doc. 46–6 (termination agreement signed July 30, 2020).) The purpose of that agreement then, was not just to end the Franchisee Defendants' relationship with Fitness Together, but to clear the way for the Axio Defendants to open "new" gyms at the former franchise locations. The Axio Defendants were secret principals behind the agreement, and thus can be bound to the incorporated forum selection clauses. *See Raintree Vacation*, 702 F.3d at 442–43.

### v.        Non-Contract Claims

The only remaining issue is whether the contractual forum-selection clauses bind the Axio Defendants for *all* of Fitness Together's claims. The court finds that they do. First, the forum selection clauses broadly cover "all actions arising out of or relating to this agreement or otherwise as a result of the relationship between you and us . . . ." (Doc. 46–4 at p. 45; Doc. 46–3 at p. 38; Doc. 46–5 at p. 44.) This language covers not only Fitness Together's breach-of-contract claim but also the related trade secret, fraudulent inducement, and trademark infringement tort claims. Exercising jurisdiction over these related claims is proper because these "tort claims against non-signatories . . . ultimately depend on the existence of a contractual relationship between the signatory parties." *Magi XXI*, 714 F.3d at 724 (internal quotation marks omitted); *see also Kelvion*, 918 F.3d at 1093 (reading a forum-selection clause to cover equitable claims "inextricably linked" to the contract even absent "broadening language").

### B.   The Arbitration Clauses in the Franchise Agreements Do Not Limit the Court's Jurisdiction or Authority to Enjoin at This Time

The Axio Defendants next argue that, if they are bound to the forum-selection clauses, then all parties to this suit are also bound to the Franchise Agreements' arbitration clauses. (Doc. 38 at pp. 4–7.) According to the Axio Defendants, those arbitration clauses deprive the court of its authority to enter a preliminary injunction. (*See id.*) First, arbitration clauses can't destroy a court's personal jurisdiction over a defendant even if the court nevertheless must compel arbitration.[6] Second, this issue is not properly before the court at this time; the Axio Defendants have not moved to compel arbitration, and Fitness Together has not had an adequate opportunity to respond to this argument. Third, all of the forum-selection clauses mandate initiating a lawsuit based on the Franchise Agreements in a state or federal court in Colorado, so Fitness Together was "within its contractual rights" to "resort to the district court," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726, 728 (10th Cir. 1988). (Doc. 46–4 at p. 45; Doc. 46–3 at p. 38; Doc. 46–5 at p. 44.) Fourth, the contracts themselves all appear to make an exception to arbitration for injunctive relief, and one contract explicitly carves out the specific claims at issue here from arbitration.[7] (Doc. 46–4 at p. 50;

---

[6]   Arbitration clauses are "in effect, a special kind of forum-selection clause." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974). And forum-selection clauses cannot destroy jurisdiction: "The argument that [forum-selection] clauses are improper because they tend to 'oust' a court of jurisdiction is hardly more than a vestigial legal fiction." *M/S Bremen*, 407 U.S. at 12. Indeed, "no one seriously contends that the forum selection clause 'ousted' the District Court of jurisdiction . . . the threshold question is whether that court *should have exercised its jurisdiction* . . . by specifically enforcing the forum clause." *Id.* (emphasis added).

[7]   The court notes that the Supreme Court is currently deciding a case that will likely determine whether this court, rather than an arbitrator, can even determine the arbitrability of these claims. *See Archer & White*

Doc. 46–5 at p. 48; Doc. 46–3 at p. 42.) Finally, the Federal Arbitration Act, which governs all of the clauses here, did not revoke this court's inherent equitable power to enjoin parties pending arbitration even where the contract at issue expressly mandates arbitration. *Dutton*, 844 F.2d at 728 (allowing a preliminary injunction to stay in force until "the issue of preserving the status quo is presented to and considered by the arbitration panel"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1052-54 (4th Cir. 1985). For these reasons, the Franchise Agreements' arbitration clauses do not deprive the court of jurisdiction over the Axio Defendants or of its inherent authority to enjoin them pending trial or arbitration, as the case may be.[8]

## II.  Fitness Together's Preliminary Injunction Motion

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018). To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunction; (3) that its "threatened injury" without the injunction outweighs the opposing party's

---

*Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 280-82 (5th Cir. 2019), *cert. granted*, — S. Ct. —, No. 19-963, 2020 WL 3146679 (June 15, 2020) (mem.). But even the defendants seeking to compel arbitration in that case appear to have conceded that a court may "preserve the status quo pending arbitration" where there is a contractual carve-out for injunctive relief. *Id.* at 282-83.

[8]  To be clear, the court does not decide at this time what claims, if any, must go to arbitration. Resolution of the motion to dismiss and preliminary-injunction motion do not require resolution of that issue.

under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## A.   Likelihood of Success on the Merits

Fitness Together has shown it is likely to succeed on the merits of its breach of contract, trade secret, and trademark infringement claims (the claims subject to this motion). The Defendants have not disputed any of these claims on the merits, and instead opted solely for a jurisdictional defense that has failed.

First, Fitness Together has presented the Franchise and Termination Agreements that the Franchisee Defendants, through the Axio Defendants, are likely to have breached. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (listing elements for breach of contract claim in Colorado); *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 912 (Colo. Ct. App. 1997) (upholding an injunction enforcing a non-compete covenant against a non-signatory). Although the Axio Defendants were not signatories to the Franchise or Termination Agreements, Colorado law[9] binds non-signatories to covenants not to compete "when he or she assists a signatory to violate the covenant." *Gold Messenger*, 937 P.2d at 912. Under this doctrine, "a third party is bound by the covenant at least to the extent that he or she assists the covenantor to violate the covenant

---

[9]   The court finds that Colorado law applies to the scope of the non-compete provision because (1) Fitness Together's breach of contract claim is a supplemental state-law claim; (2) interpretation of a contract is generally a substantive issue governed by state law under the holding in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); (3) Colorado is the forum state; and (4) the Franchise Agreements contain choice-of-law clauses pointing to Colorado law while ignoring Colorado's choice-of-law rules. (Doc. 46–3 at p. 37; Doc. 46–4 at p. 44; Doc. 46–5 at p. 44.) All roads lead to Colorado law here.

not to compete." *Id.* Fitness Together has submitted ample evidence that Ms. Mellinger worked closely with the Axio Defendants as their agent or de facto owner to violate the covenants here. So Fitness Together has established that it is likely to prevail on its breach of contract claim against all defendants, including the Axio defendants.[10]

To be sure, Colorado Revised Statute § 8-2-113 generally disfavors enforcement of non-compete agreements. But that Section exempts the kind of contracts at issue here—those that protect trade secrets and apply to professional staff. *Id.* § 8-2-113(2). Ms. Mellinger likely qualifies as "executive and management personnel" under the statute as a member of the Franchisee LLC's and the listed "owner" on the old Axio Defendants' website, and Fitness Together has provided strong evidence that the Franchise Agreements were written to protect its trade secrets. *Id.* § 8-2-113(2)(d). (Doc. 14 at p. 16 (referencing the numerous provisions in the Franchise Agreements that recognize the importance of Fitness Together's purported trade secrets).) Also, the non-compete provisions that cover a three-mile radius for only one year are likely reasonable and thus enforceable under Colorado law. *See Harrison v. Albright,* 577 P.2d 302, 305 (Colo. Ct. App. 1977) (noting that covenants for terms up to five years and encompassing 100-mile radii have been upheld and placing the burden of proof on the party challenging enforcement).

Fitness Together has met its burden of proving Ms. Mellinger's and the Axio Defendants' violations of the non-compete provisions; indeed,

---

[10]   Even if the Axio Defendants are not bound to the covenants in the Franchise Agreements, "non-signatories may not avoid an injunction simply by being non-signatories to a franchise agreement" as addressed further below. *See infra* Section II(E); *The Maids Int'l, Inc. v. Maids on Call, LLC,* No. 8:17CV208, 2017 WL 4277146, at *4 (D. Neb. Sept. 25, 2017) (collecting cases).

the Axio Defendants are all operating competing fitness studios in the locations subject to the non-compete provisions. Because all defendants, including the Axio Defendants, are bound to the valid non-compete provisions, they are likely liable for breach of those contracts.

Second, Fitness Together has established that Defendants likely misappropriated some trade secrets—either through wrongful acquisition or disclosure—including client lists, proprietary client information, and a proprietary nutrition guide, all in violation of state and federal law. *See* 18 U.S.C. § 1839 (5); *see also Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. Ct. App. 1988). (*See* Doc. 14 at pp. 17–18.) Fitness Together has provided sufficient evidence to show that Defendants likely used Fitness Together's client lists and nutrition guide in violation of the Franchise Agreements as a way to continue operations at the former franchise locations. (*See* Doc. 14 at pp. 17–19.) Even if not all of this information qualifies as protected trade secrets under state or federal law, the parties contractually agreed that defendants could not use this information outside the scope of the franchise relationship. (Doc. 46–6 at p. 3 (forbidding the use of "Proprietary Assets" as defined in the Franchise Agreements).) So even if Defendants' use of this information did not constitute trade secret misappropriation, that use likely qualifies as a breach of contract.

Third, Fitness Together has established that it will likely succeed on its trademark claims. (*Id.* at pp. 19–20.) Fitness Together has established that (1) it has a valid registered mark (Doc. 46–2); (2) Defendants have used that mark without authorization (Doc. 13 at ¶ 77); and (3) the unauthorized use likely caused customer confusion (Doc. 46–16 (Franchisee Defendant agent using Fitness Together-email to bring clients back in to use one of the rebranded Axio gyms). *Big O Tires, Inc., v. Bigfoot 4x4, Inc.*, 167 F. Supp. 2d 1216, 1222 (D. Colo. 2001). While it

remains unclear whether the Defendants currently violate Fitness Together's trademarks, it is clear that they are likely not allowed to do so. So the court will enjoin the Defendants from committing any future violations under this claim. Thus, for all the claims under which Fitness Together seeks injunctive relief, it has established likelihood of success on the merits.

## B.   Irreparable Harm

Fitness Together has shown irreparable harm. The Tenth Circuit has held that, while violations of non-compete provisions routinely result in irreparable harm, such a finding is not automatic. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004).

> Such a finding does not rest solely on the breach of the agreement and the resulting loss of exclusivity rights. Rather, the irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position.

*Id.* at 1264. The "majority of courts that have considered the question have concluded that franchising companies suffer irreparable harm when their former franchisees are allowed to ignore reasonable covenants not to compete." *Bad Ass Coffee Co. of Haw.i v. JH Enters., L.L.C.*, 636 F. Supp. 2d 1237, 1249 (D. Utah 2009). Injunctive relief is especially warranted when the ex-franchisee "operates out of the same locations as the former . . . franchises." *See The Maids*, 2017 WL 4277146, at *9; *see also Bad Ass*, 636 F. Supp. 2d at 1249.

Fitness Together has shown irreparable harm based on the difficulty in calculating damages and the intangible harms it has suffered such as loss of goodwill and competitive market position. *Echostar*, 356 F.3d at

1264. Fitness Together has provided testimony from its CEO concerning the "highly competitive fitness and nutrition industry." (Doc. 46–1 at ¶ 69.) Fitness Together's CEO notes that it is very difficult to win back customers, particularly personal training customers, once they've gone to another gym. (*Id.* at 71.) The Axio Defendants are operating out of the exact same locations that the Franchisee Defendants operated their Fitness Together franchises, confusing prior Fitness Together customers and damaging Fitness Together's goodwill. *See The Maids*, 2017 WL 4277146, at *9 (noting that the franchisor had "lost customers in the areas protected by the Franchise Agreements, and could irreparably lose market presence in the area"). Defendants' unauthorized use of Fitness Together's trademarks in signage and emails to clients further exacerbates that confusion. Indeed, Defendants used their Fitness Together email accounts to transition at least one prior customer seamlessly into the Axio Fitness fold. (*See, e.g.*, Doc. 46–16.) Every day the Axio Defendants operate in the same locations as the former Fitness Together franchises, Fitness Together loses goodwill, customers, and market presence in a way not easily calculable by damages. These intangible harms damage Fitness Together's franchise model, and Fitness Together has established irreparable harm here.

## C.   The Balance of Harms

The balance of harms favors injunctive relief. While an injunction may impose serious harms on the Defendants—including the temporary closure of their businesses—that injury "may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002); *see also Bad Ass*, 636 F. Supp. 2d at 1251 ("Courts balancing harms to former franchisees who violated non-compete agreements have similarly been unwilling to allow defendants to

point to harms that they could have avoided by abiding by their contract."). On the other hand, Fitness Together suffers considerable harm each day the Defendants are allowed to flout the non-compete provisions in the Franchise Agreements as addressed above.

### D.   The Public Interest

The public interest similarly favors an injunction here. As is often true in a franchisee case like this, the Defendants' employees may temporarily lose their employment once the court enjoins the Defendants. Indeed, "the court is sympathetic to the employees who are basically caught in the middle of the dispute." *Bad Ass*, 636 F. Supp. 2d at 1252. But that harm is counterbalanced by the longer-term harm that would arise from denying relief in cases like this. The cases and statutes discussing the enforceability of restrictive covenants and irreparable harm are based on the understanding that preventing this sort of unfair competition helps protect and encourage investment in the very businesses that give rise to these opportunities. If Fitness Together had known that its franchisee could simply open new gyms in the same locations using its trade secrets and goodwill, it is unlikely it would have opened the studios in the first place. The employees would be worse off, not better. And Ms. Mellinger and the other Defendants are free, of course, to open studios in other locations that comply with the agreements, at which the employees could work. The court thus concludes that an injunction is not adverse to the public interest.

### E.   Scope of the Injunction

Federal Rule of Civil Procedure 65(d) allows courts to enjoin the parties; the parties' officers, agents, servants, employees, and attorneys; and those "who are in active concert or participation" with the aforementioned persons. Fitness Together seeks to enjoin all defendants and Ms.

Mellinger's mother Margaret Garwood who is a non-party. The court finds it necessary to enjoin all defendants, including the Axio Defendants, under all claims subject to this motion. Regarding the covenant not to compete, although the Axio Defendants are not signatories to the Franchise Agreements, the court will not allow Ms. Mellinger to use the Axio Defendants as a vehicle to circumvent those agreements: "non-signatories may not avoid an injunction simply by being non-signatories to a franchise agreement." *The Maids*, 2017 WL 4277146, at *4.[11] Fitness Together also asks the court to enjoin Ms. Mellinger's mother, Ms. Garwood. But she is not a party, and, in any event, enjoining her is not necessary. To the extent she has any involvement other than being named in the Axio Defendants' organizing documents, she and anyone else who is acting "in active concert or participation" with the Defendants to operate the studios is bound by the injunction upon receiving actual notice. Fed. R. Civ. Pr. 65(d)(2).

### F.    Bond and Security

Under Federal Rule of Civil Procedure 65(c), the movant must give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." The parties have provided no briefing on what would be an appropriate bond in this case, although Fitness Together has agreed to

---

[11]    The court in *The Maids* cited several courts that have enjoined non-signatories in the franchise context pursuant to Federal Rule of Civil Procedure 65(d)(2). *See The Maids*, 2017 WL 4277146, at *4 n.3 (collecting cases). For instance, an injunction may be proper where the non-signatory took over the signatory's employees and assets; where the ex-franchisee remained a tenant at the same location as the former franchise; or where the non-signatory continued the previously franchised business without interruption. *Id.*

post an appropriate bond. Based on the limited evidence and argument before it, the court finds that a bond of $50,000 is appropriate.

## CONCLUSION AND ORDER

The Axio Defendants' motion to dismiss (Doc. 22) is **DENIED**.

Fitness Together's Motion for a Preliminary Injunction (Doc. 14) is **GRANTED IN PART**.

The court **ORDERS** that all Defendants; all officers, agents, servants, and employees of Defendants; and all persons in active concert or participation with Defendants (collectively, the "Enjoined Parties") are preliminarily enjoined as follows:

1. Enjoined Parties are hereby **ENJOINED** from having any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative, agent, or in any other capacity in any "Competitive Business"—as defined in the Franchise and Termination Agreements—located or operating within a three-mile radius of any of the Franchisee Defendants' former "Studios" (as defined in the Franchise Agreements) or within a three-mile radius of any other "Studio" (as defined in the Franchise Agreements) until the earlier of either (1) the date imposed by the Franchise Agreements as modified by the Termination Agreement or (2) the date when this court withdraws its injunction.

2. Enjoined Parties are hereby **ENJOINED** from copying, disclosing, or using "Proprietary Assets" (as defined in the Franchise Agreements) except as expressly allowed for under the Franchise Agreements as modified by the Termination Agreement.

3. Enjoined Parties are hereby **ENJOINED** from displaying, infringing upon, or using in any other manner Fitness Together's common-law and registered "Fitness Together" and "Nutrition Together" trademarks or any variation thereof, or any other valuable Fitness Together trademark except as expressly allowed for in the Franchise Agreements as modified by the Termination Agreement.

It is **FURTHER ORDERED** that Fitness Together shall provide security pursuant to Federal Rule of Civil Procedure 65(c) in the amount of **$50,000** to cover the costs and damages sustained by Enjoined Parties should this court ultimately determine that Enjoined Parties were wrongfully enjoined.

DATED: October 16, 2020                    BY THE COURT:

<br>

_____
Hon. Daniel D. Domenico
United States District Judge